



**bp**

This branded jobber contract ("Contract") dated _____ April 10, 2001_____ is by and between

☐ Amoco Oil Company, a Maryland corporation, or its successor, and/or as the case may be

☑ BP Exploration & Oil Inc., an Ohio corporation or its successor
with such entity designated by an "X" before its name and hereinafter referred to as "Company", and with a principal
office located at

_____ 4850 East 49th Street, Cuyahoga Hts. OH 44125 _____
(State complete Company address including street address, city and zip code)

and _____ Armada Oil & Gas Co., Inc _____ ("Jobber")
(State exact legal name of Jobber)

a _____ Corporation _____ with its principal offices located at
(State type of legal entity, corporation, partnership, LLC, sole proprietorship, etc.)

_____ 13530 Michigan, Dearborn MI 48126 _____
(State complete address of Jobber's principal office including street address, city and zip code. A post office box is not sufficient.)

Now, Therefore, Company and Jobber, intending to be legally bound, agree to the following:

1. **Term.** The term covered by this Contract will be for a period of ▮▮▮ year(s) beginning on _____
and ending on _____ ▮▮▮▮▮ _____, unless terminated earlier by law or by the terms of this Contract or
unless extended by Company upon written notice. If the franchise relationship underlying this Contract continues for any
reason beyond the expiration date indicated above, this Contract will be extended until terminated or until superseded by a
new branded jobber contract, if offered.

2. **Products, Quantities and Approved Retail Sites.**
(a) **Products and quantities to be purchased/Resale from Approved Retail Sites (Attachment A).** Company agrees to
sell and Jobber agrees to purchase and receive Company's currently offered and available branded petroleum products as
determined and designated by Company ("Products"), and as more fully and specifically set forth in Attachment A, a copy of
which is attached to and incorporated in this Contract. Jobber agrees to purchase these Products ratably in the quantities set
forth in Attachment A within every continuous 12-month period, or any portion thereof, during the term of this Contract.
Attachment A will also set forth, among other things, the retail sites approved under paragraph 6(a) below from which the
Products purchased from Company may be resold ("Approved Retail Sites"). Products purchased under this Contract will not
be resold, under Company's Trade Identities (as defined in paragraph 5(a) below), from any location unless and until said
location is set forth on Attachment A and/or unless and until said location has been approved pursuant to paragraph 6(a)
below. Jobber will advise Company immediately if it is no longer able to supply an Approved Retail Site listed in Attachment A.
The cessation or reduction in supply of Products to an Approved Retail Site will not reduce the Jobber's annual Product
purchase requirements set forth on Attachment A, without Company's written consent.

(b) **Annual development of Attachment A.** Jobber will provide the following information to Company between January 1 and
February 15 of each Contract year of the Contract term, or at any other times requested by Company, for the purpose of
developing each and every Attachment A for each Contract year of the Contract term, the quantities of all Products supplied to
and resold during the prior calendar year, by Product grade, at each Approved Retail Site. Company may also require that
Jobber provide an estimate of any additional quantities of Products that it expects to purchase and supply during any
Contract year, by Product grade, for any and all sites that are newly approved during said year. Company may use this
estimate to amend or develop a new Attachment A. In the case of a trial franchise, Jobber will provide, 90 days prior to the
beginning of the Contract term, its estimate of the quantities of all Products that it expects to purchase and supply during the
Contract year, by Product grade, at each of its newly Approved Retail Sites.

5. **Company's Trade Identities and Image**

(a) **Use of Trade Identities generally.** Jobber will be permitted to use, and will be permitted to allow the jobber-dealers and sub-jobbers it supplies with Products purchased under this Contract ("Jobber-Marketers") to use -- on a non-exclusive, limited, site-specific basis at Approved Retail Sites -- certain and specifically designated Company trademarks, service marks, trade names, brand names, trade dress, logos, color patterns, color schemes, design schemes, insignia, image and the like (individually and collectively, "Trade Identities") in connection with the advertising, distribution and/or resale of the Products authorized by, supplied by and/or purchased from Company under this Contract. Company's Trade Identities may include those in use at the time this Contract is executed and may also include, in the Company's sole discretion, those Trade Identities that the Company may subsequently develop, adopt or otherwise obtain through licenses or other means. Company will retain, at all times, the right to determine which Trade Identities will be used or displayed, and the manner of their use or display, at an Approved Retail Site and the right to restrict the use or display of certain Trade Identities to certain Approved Retail Sites (or to certain locations at an Approved Retail Site). Company will also have the right, at any time and for any reason, to revoke its approval to use certain or all of its Trade Identities at certain or all Approved Retail Sites (or at certain locations at an Approved Retail Site) -- as further provided in paragraphs 5(e) and 6(b) below -- and, where applicable and in its sole discretion, to substitute any other Trade Identities in their place.

(b) **Use of Trade Identities governed by this Contract, related agreements and related guidelines, etc.** The permission to use Company's Trade Identities will be governed by the terms and conditions of this Contract and related agreements, including all attachments, schedules, appendices and amendments attached to and incorporated in those agreements. In addition, Company's Trade Identities will only be used in accordance with -- and only if Jobber complies with --the guidelines, policies, procedures, programs, requirements, specifications, standards (both operational and visual) and strategies issued by Company, as amended from time to time.

(c) **Use of Trade Identities on signage.** Jobber will be permitted to acquire and display approved signage bearing Company's Trade Identities, in connection with the advertising, distribution and/or resale of Products under this Contract, on an Approved Retail Site-specific basis. Under no circumstances will Jobber be allowed to relocate signage bearing Company's Trade Identities to another location without Company's consent. Jobber will provide Company with a list of all signage bearing Company's Trade Identities in Jobber's possession and/or control and the location of said signage, upon Company's request. In addition to the terms and conditions of this Contract, the use of Company's Trade Identities on all signage and the use of that signage generally will be governed by a Trade Signage Agreement (Jobber), a copy of which is attached to and incorporated in this Contract.

(d) **Use of Trade Identities in conjunction with the sale of Representative Amounts of certain Products.** At all times at each Approved Retail Site, including each Jobber-Marketer Approved Retail Site, Jobber will offer for sale, or cause to be offered for sale, representative amounts of each grade of Company-designated Products that are necessary, in Company's discretion, to satisfy public demand ("Representative Amounts"). If Jobber ceases to offer or make available one or more of these designated Products in the required Representative Amounts at an Approved Retail Site, Jobber will cease using or displaying, or cause its Jobber-Marketers to cease using or displaying, Company's Trade Identities at that site.

(e) **Use of Trade Identities in conjunction with Company's retail marketing strategies and development plans, image programs and standards.** At each Approved Retail Site, including each Jobber-Marketer Approved Retail Site, Jobber will comply with, and ensure that all of its Jobber-Marketers comply with, Company's then current image programs and standards (both operational and visual), as amended from time to time. As part of this image compliance requirement, Jobber will ensure that no items of a pornographic or sexually explicit nature are displayed, used, stored, offered, rented or sold at any Approved Retail Site. For purposes of this Contract, items of this nature will include, but will not be limited to, pornographic, sexually explicit or so-called "adult:" magazines; videotapes; compact disks; digital video disks; or like materials. Jobber also agrees that its right to use Company's Trade Identities under this Contract will be subject to Company's then current retail marketing strategies and development plans, as amended from time to time. If an Approved Retail Site no longer conforms or fails to conform to Company's then current retail marketing strategies and development plans, as amended from time to time, or to Company's then current image programs or standards (both operational and visual), as amended from time to time, Company may revoke its prior approval to use certain or all of its Trade Identities at the Approved Retail Site, in which case Jobber will cease using or displaying, or cause its Jobber-Marketer to cease using or displaying, certain or all of Company's Trade Identities at that site, whichever the case may be.

(f) **Use of Trade Identities on Jobber's property including websites.** Jobber will be permitted to display Company's Trade Identities in conjunction with Jobber's websites, business forms, advertising materials, structures, vehicles, and other Jobber property directly related to the advertising, distribution and/or resale of Products under this Contract. Jobber may only do so, however, if the words "Products Distributor" or "Products Jobber" appear immediately adjacent to the displayed location of said Trade Identities. Company will have the right to approve such use of its Trade Identities in advance and to revoke its approval at any time and for any reason. If Company exercises its right to revoke, terminate or nonrenew or if the property in question is sold or otherwise transferred, Jobber will immediately cease using or displaying, or cause any third party to immediately cease using or displaying – or will immediately remove, cover or obliterate, or cause any third party to immediately remove, cover or obliterate -- the Trade Identities on the property in question.

(g) **Misuse of Trade Identities with Jobber's company name or Jobber's own trade identities.** Jobber will not use any of Company's Trade Identities as part of Jobber's company name. If Jobber has formed a company or has acquired a company that uses any of Company's Trade Identities as part of Jobber's company name, it will be required to amend its articles of incorporation or organization so as to delete Company's Trade Identities from its company name. Likewise, Jobber will not use any of Company's Trade Identities as part of Jobber's own trade identities. If Jobber has developed trade identities or has acquired trade identities that incorporate any of Company's Trade Identities as part of Jobber's trade identities, it will be required to delete Company's Trade Identities from its own trade identities.

(h) **Misuse of Trade Identities in connection with certain sales.** Jobber will not use any of Company's Trade Identities in connection with the advertising, distribution and/or resale of: (1) any dilution or adulteration of a Product authorized by, supplied by and/or purchased from Company; (2) any mixture or blend of Products authorized by, supplied by and/or purchased from Company, without Company's prior written consent (which consent may be revoked at any time and for any reason); (3) any Product authorized by, supplied by and/or purchased from Company but sold under an incorrect or inappropriate Company Mark or sold through unapproved or disapproved packages, containers or equipment; or (4) any product not authorized by, supplied by and/or purchased from Company.

(i) **Company's right to audit.** To verify Jobber's performance under this Contract and related agreements or as part of a Company compliance program, as issued and amended from time to time, Company will have the right to: audit records in the possession or control of Jobber or its Jobber-Marketers; inspect all Approved Retail Sites; and sample all Products in the possession or control of Jobber and/or its Jobber-Marketers. Jobber will cooperate fully and completely throughout the audit and inspection processes, and ensure that its Jobber-Marketers cooperate fully and completely. If Jobber designates its records as confidential, Company will not voluntarily disclose said information to anyone without Jobber's written consent, except to those Company employees and agents with a need to know.

(j) **Discontinued use of Trade Identities upon expiration or termination of this Contract.** Upon the expiration or termination of this Contract, for any reason, Jobber will immediately cease using or displaying, and cause its Jobber-Marketers to cease using or displaying, Company's Trade Identities and will dispose of all signage in accordance with the Trade Signage Agreement. All remaining evidence of Company's Trade Identities will be immediately obliterated by Jobber. If Jobber does not immediately cease using or displaying, and cause its Jobber-Marketers to cease using or displaying, Company's Trade Identities, Company will have the irrevocable right to use any means necessary to remove, cover or obliterate the Trade Identities, including entering upon the relevant premises or filing a legal action, with Jobber's full and complete cooperation and at Jobber's expense. Jobber will reimburse Company for all expenditures incurred in removing Company's Trade Identities hereunder.

## 6. Site Approval.

(a) **Use of Company's Trade Identities at each Approved Retail Site.** It is and will be an on-going condition of the right to use Company's Trade Identities under this Contract, that Jobber must first obtain Company's prior written consent for each and every location that Jobber desires to identify with Company's Trade Identities, including all Jobber-Marketer retail locations. The approval and designation as an Approved Retail Site will be within Company's sole discretion and will be based on certain factors and upon certain criteria relative to the site, including but not limited to: current or proposed appearance; current or proposed Trade Identities to be used; location of underlying real estate; ownership status of underlying real estate; current or proposed mode of operation; current or proposed offer; current or projected volume; current or proposed hours of operation; current or proposed training capabilities; current or proposed improvements, facilities or equipment; enrollment or participation in the Company's "mystery" shop program; Company's then current image programs and standards (both operational and visual), as amended; or Company's then current or amended retail marketing strategies and development plans in the vicinity of the proposed location, or elsewhere. For purposes of emphasis and elaboration, but without limitation, Company will have the right to require gasoline dispensers to be covered by approved canopies and to be equipped with approved card readers. Company will also have the right to determine the appropriate geographic density and channel-of-trade mix for all retail locations identified and/or to be identified with Company's Trade Identities. It will be a further requirement that Jobber has used and/or is using its best efforts to develop, operate and/or supply its then currently Approved Retail Sites. Company's right of approval hereunder will also apply to those situations where Jobber desires to supply a retail location that is then currently identified with Company's Trade Identities but supplied by another branded jobber or other supplier of Company's Products. Company will retain, at all times, the right to determine or the right to approve which Trade Identities will be used or displayed, and the manner of their use or display, at an Approved Retail Site and the right to restrict the use or display of certain Trade Identities to certain Approved Retail Sites (or to certain locations at an Approved Retail Site).

(b) **Site approval revoked.** Company will have the right to revoke its prior approval identifying an Approved Retail Site if the site no longer conforms to or fails to conform to: the terms or conditions of this Contract and related agreements; the Company's then current image programs or standards (both operational and visual), as amended from time to time; the Company's then current retail marketing strategies and development plans, as amended from time to time; or to any relevant law or regulation. Company will also have the right to revoke its prior approval identifying an Approved Retail Site based upon, but not limited to, the factors and criteria set forth in paragraph 6(a) above. For purposes of emphasis and elaboration, but without limitation, Company will have the right to revoke its prior approval identifying an Approved Retail Site if – after 6

associated with the operation of the EPOS equipment, including but not limited to costs associated with satellite connections, access and telecommunications and upgrading the EPOS equipment or related software or firmware.

## 9. Additional Jobber Responsibilities.

(a) **Bulk plants.** Jobber will operate, where necessary, one or more bulk storage plants so as to efficiently perform its supply and distribution functions under this Contract.

(b) **Transport and tank trucks.** Jobber will operate or cause to operate, where necessary, a sufficient number of transport and/or tank trucks so as to efficiently perform its delivery functions under this Contract.

(c) **Deliveries for Company.** From time to time, Company may request that Jobber make deliveries, from Jobber's inventories of Products purchased under this Contract, to other Company customers. If Jobber elects to make any such deliveries, Company will pay Jobber a mutually agreed upon handling fee.

(d) **Jobber Market Plans.** As part of Company's Jobber Market Planning Process, as amended from time to time, Jobber will provide Company – at a minimum -- with a 3-year jobber market plan, in a format provided by or acceptable to Company. Jobber will update its jobber market plan each year, also in a format provided by or acceptable to Company. If Jobber designates its jobber market plan as confidential, Company will not voluntarily disclose said information to anyone except to those Company employees and agents with a need to know.

(e) **Emergency notification procedures.** From time to time Company may provide Jobber with notification procedures to be utilized if and when emergency situations or other situations occur at any Approved Retail Site and/or if and when such situations directly or indirectly involve the Trade Identities being utilized by Jobber. For purposes of this Contract, reportable situations may include, but may not be limited to: death or serious injury; transport or tank truck accidents; Product spills or other incidents of significant environmental impact and other significant events as defined from time to time. Jobber agrees that it will comply with said procedures, if and when provided, and if and when a defined, reportable situation occurs.

(f) **Communication with Company via the Internet.** Within 6 months of Company's request, Jobber must be equipped with e-mail capability and access to the Internet so that Company may communicate and exchange information with Jobber via the Internet and via the Company's intranet, extranet and/or web pages.

(g) **Customer inquiries and complaints.** Jobber will develop a program designed to respond to and resolve customer inquiries or complaints within no less than 10 business days of receipt. This program will apply to inquiries and complaints regarding an Approved Retail Site, including its Jobber-Marketer Approved Retail Site, that are either received directly by Jobber or those referred to Jobber by Company.

(h) **Mystery shop program.** If Company sponsors or conducts a "mystery" shop audit program, Jobber will enroll and participate in such a program at each Approved Retail Site selected by Company. Jobber will promptly take corrective measures at each and every Approved Retail Site that scores below the target score established by Company for the marketing area that includes said Approved Retail Site. If Jobber desires to use its own "mystery" shop service, said vendor must: (1) be approved by Company in writing; (2) use Company's approved "mystery" shop forms; and (3) provide Company with audit results promptly, using said forms. Company reserves the right to withdraw its approval of any "mystery" shop service at any time and for any reason.

(i) **Branded lubricants and motor oils.** Jobber will use its best efforts to offer for sale Representative Amounts of certain and specifically designated lubricants and motor oils at each of its Approved Retail Sites, including its Jobber-Marketer Approved Retail Sites.

## 10. Jobber as Independent Business/Sale of Competitive Products.

(a) **Independent business.** Company and Jobber are and will remain separate and independent businesses. None of the provisions of this Contract are intended to provide a party hereto with any management direction or control over the other party's business, business operations or employees. Jobber has no authority to act, or employ any person to act, as an agent for or on behalf of Company. Jobber will not place or allow the placement of any signage upon or near any premises owned, leased, operated or supplied by Jobber which might indicate that Company is the owner or operator of the business conducted upon said premises.

(b) **Sale of competitive products.** Subject to paragraph 5(h) above and all other applicable provisions of the Contract, nothing in this Contract will prevent Jobber from purchasing supplying or reselling the products of Company's competitors. In the event that Jobber does purchase and resell competitive-brand products, it will comply with the applicable terms and conditions of this Contract and all applicable guidelines, policies, procedures, requirements, specifications and standards issued by Company, as amended from time to time, including any policies pertaining to the proper handling of non-Company motor fuels.

## 11. Jobber-Marketers.

(a) **Acts and omissions of Jobber-Marketers imputed to Jobber.** Subject to paragraph 26 below, Jobber will inform those Jobber-Marketers permitted to use Company's Trade Identities of the specific terms and conditions of this Contract and all related agreements, including all attachments, schedules, appendices and amendments attached to and incorporated in those agreements which pertain to the use of Company's Trade Identities and related matters. In addition, Jobber will inform those Jobber-Marketers of the specific guidelines, policies, procedures, programs, promotions, requirements, specifications, standards (both operational and visual) and strategies periodically issued by Company, as amended from time to time, which pertain to the use of Company's Trade Identities and related matters. Notwithstanding the Jobber's best efforts to ensure its Jobber-Marketers' compliance, and regardless of any contractual relationship between Jobber and its Jobber-Marketer, any act or omission by a Jobber-Marketer that, if committed or omitted by Jobber would place Jobber in violation of this Contract or related agreements, will be imputed to Jobber and will give Company the right, in its sole discretion, to take appropriate action against Jobber up to and including site approval revocation or termination of this Contract.

(b) **Actions against Jobber-Marketers.** Nothing in this Contract will prevent or preclude Company from exercising any legal or equitable rights against a Jobber-Marketer directly, separate and apart from any actions taken against Jobber.

## 12. Right of First Offer and Right to Purchase.

(a) **Company's Right of First Offer/Jobber's Company-Branded Assets.** Jobber will not sell, lease or otherwise transfer – or allow the sale, lease or transfer – of any assets, or portions thereof, in its possession or control, or in the possession or control or its subsidiaries, affiliates or principals as the case may be, which are related to this Contract and which, at any time during the franchise relationship, have been identified with or by Company's Trade Identities including but not limited to Jobber-owned or leased: Approved Retail Sites; other retail locations, bulk plant and terminal facilities; transport and tank trucks; and all related real and personal property, contract rights, or good will ("Jobber's Company-Branded Assets") without first giving Company a right of first offer to purchase or otherwise acquire the assets in the manner described in paragraph 12(b) below ("Right of First Offer").

(b) **Company's Right of First Offer/Information Jobber Must Provide.** To satisfy its obligations under paragraph 12(a) above, Jobber will promptly submit to Company written notice and a term sheet ("Term Sheet") containing the following items:(i) the Jobber's Company-Branded Assets intended to be sold, conveyed or otherwise transferred; (ii) the amount and nature of consideration sought in the proposed transaction, along with all payment terms; and (iii) all other substantive and commercially reasonable terms intended to be included in the proposed transaction.

(c) **Company's Right of First Offer/60 Days to Exercise.** Upon Jobber's submission of a Term Sheet, and any additional information, facts or data requested by Company to evaluate the Right of First Offer, Company will thereafter have 60 days within which to exercise its Right of First Offer, by written notice. If Company exercises its Right of First Offer, the applicable parties will have an additional 30 days to develop and execute a contract for the sale, conveyance or transfer of the Jobber's Company-Branded Assets in question ("Purchase and Sale Agreement"). Closing will be held at a time and place agreeable to Company and Jobber, but no later than 60 days after a Purchase and Sale Agreement has been signed by the parties.

(d) **Company's Right of First Offer/Right to Sell if Company Doesn't Exercise.** If Company does not exercise its Right of First Offer, Jobber will have the right within a period of 90 days thereafter to execute, or cause to execute, an agreement to sell, convey or otherwise transfer the Jobber's Company-Branded Assets in question to any third party, but only upon terms substantially and commercially identical to those set forth in the Term Sheet. It is specifically agreed that a reduction of up to and including 5% of the consideration set forth in the Term Sheet is a substantially and commercially identical similar term.

(e) **Exception to Company's Right of First Offer.** Notwithstanding paragraph 12(a) above, Jobber will be permitted to sell, lease or otherwise transfer, or cause to sell, lease or transfer, Jobber's Company-Branded Assets to: (i) a spouse, child, son-in-law, daughter-in-law, parent, brother or sister ("Immediate Family Member"), if Jobber is a sole proprietorship; (ii) an Immediate Family Member of a partner's immediate family or of a member's immediate family, if Jobber is a partnership or limited liability company ("LLC"), respectively; (iii) an Immediate Family Member of a stockholder's immediate family, if Jobber is a corporation; or (iv) a fellow partner, fellow member or fellow shareholder("Fellow Stakeholder"), if Jobber is a partnership, LLC or corporation, respectively, without providing Company with a Right of First Offer; provided, however, that each Immediate Family Member or Fellow Stakeholder who receives assets hereunder, is at least 21 years of age with at least one year of active management experience in Jobber's business and, provided further, that no agreement executed in accordance with this paragraph 12(e) will operate as a mere means or device to transfer control or ownership of Jobber's Company-Branded Assets to someone other than an Immediate Family Member or Fellow Stakeholder without providing Company with its Right of First Offer. Regardless of the exception allowed in this paragraph 12(e), Jobber will promptly provide Company with written notice as required under paragraph 12(b) above.

### 13. Assignment.

(a) **Jobber's prior written request and Company's written consent required.** Jobber acknowledges and understands that the current ownership and control of Jobber is a material element in Company's willingness to enter into this Contract. Jobber, therefore, agrees that it will not assign or transfer its interest in this Contract, or any franchise relationship attendant thereto, without a prior written request and without Company's corresponding written consent; provided, however, that Company will not unreasonably withhold its consent, and provided further, that Company will consent to Jobber's request to assign or transfer this Contract to an Immediate Family Member or Fellow Stakeholder designated by Jobber if said Immediate Family Member or Fellow Stakeholder meets all of Company's then current qualifications for new jobbers, including but not limited to, those qualifications related to financial responsibility, creditworthiness, physical and mental fitness, moral character and business experience.

(b) **Company may withhold consent.** In giving its consent to any assignment, whether voluntarily or by operation of law, Company may, at its election, condition its consent upon: (1) the agreement of the proposed assignee or transferee to enter into a trial franchise; (2) the agreement of the Jobber to simultaneously enter into a mutual cancellation of this Contract and related agreements; and (3) the satisfaction of all indebtedness owed by Jobber to Company. In addition, nothing stated in this paragraph 13 or elsewhere will limit Company's right to impose other or additional conditions on its consent or limit Company's right to withhold its consent for any reason, including but not limited to, a decision by Company to limit or reduce the number of jobbers in a geographic area.

(c) **Effect of assignment without Company's consent.** Jobber agrees and acknowledges that any attempted or purported assignment or transfer of this Contract without Company's knowledge and/or Company's prior written consent may result in the termination of this Contract and the non-renewal of any franchise relationship.

(d) **Company may assign.** Company may assign this Contract to a subsidiary, affiliate or successor of Company or to a third party.

### 14. Indemnity.

Jobber agrees to indemnify, defend and hold Company, including but not limited to Company's parents, subsidiaries, affiliates and all officers, directors, shareholders, employees and agents of Company, its parents, subsidiaries and affiliates, harmless from and against all losses, suits, claims, damages (consequential or otherwise), demands, causes of action, liabilities, fines, penalties, costs or expenses (including reasonable attorney's fees and other costs of defense) of whatever kind and nature, directly or indirectly arising in whole or in part out of: (a) any default or breach by Jobber of any obligation contained in this Contract or any other agreement with Company; (b) the receipt, shipment, delivery, storage, handling, use, sale, dispensing, labeling, invoicing, advertising or promoting of the Products by Jobber or its Jobber-Marketers; (c) any act of commission or omission at an Approved Retail Site; (d) the use of any Company property (real or personal) by Jobber or its Jobber-Marketer; (e) any allegation of agency or other alleged legal relationship by which Company is being held or might be held responsible for the acts or omissions of Jobber or its Jobber-Marketers; (f) the use of Company's Trade Identities by Jobber or its Jobber-Marketers, including the use of said Trade Identities on signage and in the advertising or promoting of Products sold or services rendered by Jobber or its Jobber-Marketers; (g) the violation of any federal, state or local law, rule, regulation, court order or government directive by Jobber, its Jobber-Marketers, or any other customers of Jobber or customers of its Jobber-Marketers; (h) all taxes incurred and owed by Jobber or its Jobber-Marketers of whatever kind and nature; (i) the revocation of any prior approval to use or display, or the loss of any right to use or display, any or all of Company's Trade Identities; (j) Jobber's termination of any franchise or non-renewal of any franchise relationship with its Jobber-Marketer(s); (k) or any other act or omission of Jobber, its Jobber-Marketers, any other customers of Jobber, or any of Jobber's -- or a Jobber-Marketer's -- agents, employees, contractors, invitees, licensees, or business associates, except such as may be due to the negligence of Company. Notwithstanding the above, Jobber agrees that the defense obligation included in this paragraph 14 will be immediate and ongoing, regardless of any ultimate allocation of negligence or other form of liability.

### 15. Insurance.

(a) **Types of coverage required.** Jobber will purchase and maintain at all times insurance covering all business operations related to this Contract. Specifically, Jobber will obtain and maintain, at its sole cost and expense, insurance coverage through an insurer, and in a form acceptable to Company, as follows: (1) Commercial general liability insurance of not less than $2,000,000 per occurrence, including coverage for contractual liability, bodily injury, property damage, fire liability, premises and operations liability, products completed operations hazard liability, independent contractor's liability, garage keeper's liability, medical expense liability, liquor liability and personal and advertising injury; (2) Worker's compensation, as required by law, and employer's liability insurance of not less than $2,000,000 for each accident and disease; (3) Business automobile liability insurance, including coverage on all vehicles owned, hired or used in the performance of this Contract, of not less than $2,000,000 per occurrence. Jobber may comply with the stated coverage amounts using alternative methods, excluding self-insurance, but including the use of umbrella coverage.

under Jobber's accounts, aggregated and accrued up to and including the termination date; (2) the aggregated and unamortized portion of any and all loans and advances made, and incentive and re-image funds provided to, Jobber; and (3) an amount established by Company, in its sole discretion, determined by multiplying the then current Attachment A annual purchase commitment (as extrapolated from the termination date up to and including the date the Contract would have expired under paragraph 1 above) by either: (i) a per gallon formula comprised of the most recent 3 year average Jobber Buying Price (weighted by grade) from Jobber's Designated Terminals, minus the most recent 3 year average Platt's spot price (weighted by grade), plus the then current cost of primary transportation to Jobber's Designated Terminals, minus 1 cent per gallon; or by (ii) 2 cents per gallon, whichever is higher. Jobber agrees that Company's losses arising out of Jobber's early termination of the Contract would not be readily ascertainable and that the Early Termination Sum, as developed above, would represent a reasonable approximation of Company's losses in the event of such early termination. Jobber also agrees that Company's rights and remedies under the various provisions of this paragraph 16 will be without prejudice to all other rights and remedies available to Company in this Contract or at law or in equity, including but not limited to the right to actual, consequential damages caused by and/or related to Jobber's breach of this Contract or any provision therein.

(h) **Company's equitable remedies.** Jobber agrees that money damages may not be a sufficient remedy for its breach of this Contract and that, therefore, in addition to all remedies available at law, Company will be entitled to specific performance, injunctive relief, declaratory judgment and/or other equitable remedies, as appropriate. Jobber agrees to waive any requirement for the posting of any bond in connection with Company's effort to seek an equitable remedy.

### 17. Deliveries.

(a) **Company's right to limit delivery quantities.** Unless otherwise specified in the attachments, schedules, appendices or amendments to this Contract, deliveries of each Product hereunder will be in equal and ratable quantities, subject to weekly or daily pro rating or any seasonal adjustments. Company will not be obligated to deliver to Jobber in any given month more than an amount equal to 1/12 of the respective 12-month quantity for each such Product as set forth in the then current Attachment A. Should Jobber at any time or for any month order in quantities less than its pro rated monthly amount, Company will not be obligated to deliver the deficiency at any time. Should Jobber at any time or for any month require more than said pro rated amount, Company will have the right, at its option, to supply such excess requirement, but if Company supplies same it will not be obligated to do so again in the future.

(b) **Company's right to specify minimum delivery quantities.** Company will have the right to specify minimum delivery quantities and either refuse to make deliveries in quantities less than such minimums or, at Company's option, to charge extra for making such deliveries.

(c) **Changes in and at Jobber's Designated Terminals.** Company will have the right, at any time, to change Jobber's Designated Terminals and/or to limit the quantity of Products that Company will make available to Jobber at any of said terminals by pro rating the annual quantities on a monthly, weekly or daily basis. Company will also have the right to determine and designate the percentage of Jobber's Attachment A quantities that Company will make available to Jobber at Jobber's Designated Terminals.

(d) **Returned vapors.** Any petroleum product vapors that are redelivered to Company's terminals or other delivery points from Jobber's transport equipment in connection with the operation of any vapor recovery equipment or system, will become the property of Company without any accounting therefor by Company to Jobber.

### 18. Determination of Quantities.
The quantities of Products sold hereunder will be determined on the basis of the temperature thereof at 60°F in accordance with "Table No. 6B of API Standard 2540, Manual of Petroleum Measurement Standards, Chapter 11.1--Volume Correction Factors--Volume II" (or any API/ASTM reissue or replacement thereof in effect at the time of measurement), or at Company's option, on the basis of gross volume, as established by Company for Jobber's class of trade in the applicable geographic area, or as otherwise required by law.

### 19. Demurrage.
Jobber will pay any and all demurrage accruing on any barges, tank cars, transport and/or tank trucks or other means of transportation at the prevailing rates therefor, at the time of the particular delay. Jobber will also pay to Company a tank car and/or truck transport rental at Company's then prevailing rates for each chargeable demurrage day.

### 20. Rejection of Products and Notice of Breach.

(a) **Rejection must occur within 48 hours of receipt.** Jobber will have 48 hours after its receipt of the Products sold under the Contract to inspect and either accept or reject said Products.

(b) **Required procedures if Products rejected.** If Jobber intends to reject, it must do so in writing within the 48 hour inspection period and Company must receive said notice within 5 business days of Jobber's receipt of the Products in question. If Jobber fails to timely reject or fails to specify a claimed shortage, defect or nonconformity, said failure will constitute an irrevocable acceptance of the Products in question and/or a waiver of the alleged shortage, defect or nonconformity.



(c) **Compliance with weights and measures laws**. Without limiting the foregoing, Jobber will comply, and require its Jobber-Marketers and other customers to comply, with any and all applicable weights and measures laws and regulations promulgated by any and all governmental authorities. In addition, Jobber will develop and maintain a program designed to assure and monitor compliance with any and all applicable weights and measures laws and regulations for each of its Approved Retail Sites, including its Jobber-Marketer Approved Retail Sites.

(d) **Company's right to monitor compliance**. As part of Company's compliance programs, Jobber acknowledges and agrees that Company will have the right to enter upon any premises, including any Approved Retail Site, in or upon which any records necessary to demonstrate Jobber's compliance with the obligations referred to in paragraphs 24(a), 24(b) and 24(c) above are kept. Jobber also grants to Company the right to obtain and/or copy any records, inspect any equipment and sample any Products covered by this Contract.

**25. Taxes.** Jobber will pay, or will reimburse Company for Company's payment of, any tax, inspection or environmental fee, duty, tariff or other like charge (including penalty and interest, if any) imposed, levied, or assessed by federal, state, local, Native American, or foreign authority upon the Products or transactions covered by this Contract, or upon the import, manufacture, storage, sale, use, transportation, delivery, or export of the Products covered by this Contract, or upon the privilege of doing any of these activities, whether imposed on or measured by the volume, price, or proceeds of sale of the Products covered by this Contract.

**26. Confidentiality.** Jobber acknowledges and agrees that the guidelines, manuals, methods, policies, procedures, programs, software, specifications, standards (both operational and visual), strategies and all related information provided by, or on behalf of, Company are proprietary and confidential (individually and collectively, "Confidential Information"). Accordingly, Jobber will not disclose any Confidential Information to third parties or use it for any purpose not authorized by Company, unless otherwise required by law. In addition, Jobber may only disclose Confidential Information to its employees and its Jobber-Marketers on a 'need to know' basis and only then if Jobber, its employees and its Jobber-Marketers undertake to keep said disclosures confidential.

**27. Notices.** All notices given under this Contract will be deemed properly served if delivered in writing personally or sent by certified mail (return receipt requested) to Company or Jobber at the addresses indicated in the introduction to this Contract. The date of notice will be the date deposited in the U.S. mail or, if delivered personally, the date of delivery. Any change of address of a party will be communicated to the other party by written notice in accordance with the terms of this paragraph 27.

**28. ==Entire Agreement.==** This Contract cancels and supersedes all prior written and unwritten agreements, attachments, schedules, appendices, amendments and understandings between the parties pertaining to the matters covered in this Contract, except any indebtedness owed to Company, and contains the entire agreement between the parties. No representations or statements, other than those expressly set forth in this Contract were relied upon by the parties in entering into this Contract. No amendment, modification or waiver of, addition to, or deletion from the terms of this Contract will be effective unless reduced to writing and signed by Jobber and a Company representative with actual authority to bind the Company, including a regional marketing vice president ("RVP"), or successor position, or other authorized Company representative with equal or superior authority.

**29. Severability.** In the event one or more paragraphs of this Contract, or portions of any paragraph, are declared or adjudged invalid or void by a court of competent jurisdiction, the remaining paragraphs of this Contract, or remaining portions of any paragraph, will remain in full force and affect. Company may, in the alternative and at its sole discretion, cancel this Contract with due notice to Jobber.

**30. No Waiver.** No course of dealing and no failure to act on any incident of breach under this Contract will be construed against Company as a waiver of its right to act in the future. The waiver of any breach of any term or condition in this Contract will not be construed as a waiver of any subsequent breach of the same or any other term or condition. Any failure by Company to enforce its rights or to seek remedies for any breach of this Contract will not prejudice its rights or available remedies for any subsequent breach by Jobber.

**31. Paragraph Titles.** The titles and subtitles of paragraphs in this Contract are for reference and identification purposes only. They are not intended to modify, restrict or expand upon the content of the paragraphs themselves.

**32. Capitalized Terms/Definitions.** Capitalized terms in the Contract will be defined and have the meanings as set forth herein.